Judge Coughenour

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,       )
                                )    NO.    CR99-666C
                  Plaintiff,    )
                                )
         v.                     )    GOVERNMENT'S SENTENCING
                                )    MEMORANDUM
AHMED RESSAM,                   )
                                )
                  Defendant.    )
_____ )

The United States of America, by and through John McKay, United States Attorney for the Western District of Washington, and Mark N. Bartlett, First Assistant United States Attorney, and Mike Lang, Assistant United States Attorney for said District, files this Sentencing Memorandum.

## I.    INTRODUCTION

On April 6, 2001, the defendant, Ahmed Ressam, was convicted of nine federal crimes related to his planned terrorist attack on U.S. soil. His crime, if carried to fruition, would have ended in the deaths and injuries of hundreds of innocent people. Following his conviction, Ressam entered into a cooperation agreement wherein he agreed to fully cooperate with the United States and other foreign governments. In exchange, Ressam hoped that the government would recommend a sentence far lower than his sentencing guideline range. Pursuant to that agreement, the parties agreed that no matter how much assistance he provided to the government, neither Ressam nor the government would recommend a sentence of less than twenty-seven (27) years

GOVERNMENT'S SENTENCING
MEMORANDUM/RESSAM - 1
CR99-666C

confinement.  Ressam has since ended all cooperation with the government, thereby breaching his agreement and effectively terminating at least two criminal cases of vital interest to national security.  Ressam now comes before this court for sentencing.

The government recommends a sentence of thirty five (35) years imprisonment.  This recommendation is based upon the defendant's sentencing guideline range, the statutory sentencing factors set forth in Title 18, United States Code § 3553, the nature of Ressam's crimes, and the nature and extent of Ressam's cooperation.

## II.    FACTUAL BACKGROUND

In November 1993, defendant Ahmed Ressam (hereafter Ressam) was arrested in Corsica on immigration violations and faced the prospect of deportation back to his native country, Algeria.  To avoid this fate, Ressam created a crude false passport in the name Tahar Medjadi and flew to Canada on February 20, 1994.  Ressam's passport was detected by Canadian immigration officials and he was arrested.  In an effort to remain in Canada and avoid deportation, Ressam applied for political asylum based on a false claim of Algerian abuse and torture.

Over the next several years Ressam lived in Montreal with other Algerian immigrants getting by on handouts from the Canadian government and money he made committing a variety of petty crimes.  In June 1995, Ressam was convicted of shoplifting and ordered to leave Canada by July 23, 1995.  He remained in Montreal, and in October 1996, Ressam was arrested again and eventually convicted of pickpocketing $300 from a tourist.

In Montreal, Ressam met a man named Abderraouf Hannachi.  Hannachi was a member of al Qaeda and was actively recruiting individuals to join the holy war and attend training in Afghanistan camps sponsored by Osama bin Laden.  Hannachi worked in conjunction with Abu Zubaydah, an al Qaeda leader who served as a gatekeeper for recruits traveling to the Afghanistan camps.

In preparation for his jihad training in Afghanistan, Ressam needed a new identity.  He obtained a genuine Canadian passport through a document vendor who

GOVERNMENT'S SENTENCING
MEMORANDUM/RESSAM - 2
CR99-666C

stole a blank baptismal certificate from a Catholic Church.  With these documents, Ressam created a new identity for himself - Benni Antoine Noris.  In March 1998, Ressam obtained the Canadian passport in the name Benni Noris.  He flew from Toronto to Frankfurt, Germany, on March 16, 1998, and then to Pakistan.  On the border between Pakistan and Afghanistan, Ressam met Abu Zubaydah.  In late April 1998, Ressam left Pakistan over the Khyber Pass into the Khalden training camp in Afghanistan.

Ressam received basic terrorist training for several months.  In September 1998, Ressam was sent to a second camp where he received advanced training on explosives. By January 1999, Ressam was ready to leave Afghanistan and return to Canada and join a terrorist cell coordinated by Abu Dohah.  Ressam departed Afghanistan with instructions to organize an attack against the United States to coincide with the new millennium.  He was allowed to choose his own target and the date for his attack.

Ressam selected Los Angeles International Airport (LAX), in order to maximize the impact on the United States public: the airport was in a large urban center, he would likely inflict a large number of civilian casualties, and the attack would target a critical transportation system and thereby effect the United States economy.  Ressam chose the date in December, 1999, in order to maximize the impact of the attack given the huge fears of the public about the pending millennium, fears ranging from computer breakdowns to the apocalypse.

On February 7, 1999, Ressam landed at LAX carrying handwritten notes on how to make a bomb, and carrying two key ingredients for making a bomb: glycol and hexamine.  Ressam, still using the Benni Noris passport, left LAX and returned to Canada.

On August 31, 1999, Ressam went to an electronics store in St. Laurent and purchased $237 worth of electronics equipment required for making a bomb.  The next day, September 1, Ressam purchased two Casio alarm watches to use as timing devices for the bombs.

GOVERNMENT'S SENTENCING
MEMORANDUM/RESSAM - 3
CR99-666C

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

On November 17, 1999, Ressam and Abdel Dahoumane, an Algerian friend of Ressam's from Montreal, flew from Montreal to Vancouver. They rented a Chrysler 300M automobile in Vancouver and, on November 19, rented a small cottage at the 2400 Court Motel in Vancouver. Ressam registered as Benni Noris and paid $994 for two weeks rent. Ressam and Dahoumane used the cottage to prepare the explosives needed for the bomb.

Meanwhile, Abdel Meskini was in Seattle under a false name waiting to meet with Ressam. Meskini had been introduced to Ressam (over the telephone) by Mokhtar Haouari and had traveled to Seattle on December 11th. Meskini understood he was to help Ressam by renting a car, providing him money and a cell phone, and helping him communicate in English.

On December 14, 1999, Ressam and Dahoumane checked out of the hotel and traveled from Vancouver to Victoria. Ressam had hidden all of the components of the bomb in the trunk of the rental car: explosives, timing devices, urea, and aluminum nitrate. Ressam purchased a bus ticket for Dahoumane back to Vancouver, and Ressam drove his car onto American ferry MV Coho at Tswassen, British Columbia. At the United States Immigration and Naturalization Service pre-clearance station in Tswassen, Ressam stated his name was Benni Noris and showed INS Inspector Gary Roberts his fraudulent Canadian Benni Noris passport. Ressam was cleared to board.

At approximately 6 p.m., the MV Coho arrived in Port Angeles. The last car debarking the ferry was Ressam's Chrysler 300M. INS Inspector Diana Dean began talking with Ressam and noticed he appeared nervous. He presented his Costco card to inspectors when they asked him for identification. Even though this was the last car of the day on the last ferry of the day (when they finished with Ressam they could all go home), the INS inspectors sent Ressam over for a secondary inspection. Inspector Danny Clem looked inside the spare-tire compartment and found a number of items, none of which was a sparetire.

GOVERNMENT'S SENTENCING
MEMORANDUM/RESSAM - 4
CR99-666C

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

The substances in the wheel well were later identified as follows: hexamethylene triperoxide diamine (HMTD), a primary explosive; cyclotrimethylene trinitramine (RDX), a primary explosive; and ethylene glycol dinitrate (EGDN), a secondary explosive similar to nitroglycerine. Four black plastic boxes were found to contain electronic timing devices designed to detonate primary explosives using 9 volt batteries. There was also a large quantity of urea, a fertilizer that can be converted to fuel for a destructive device, and aluminum sulfate.

During the search of his car, Ressam was a short distance away with Inspector Mark Johnson, who was holding Ressam by his coat. As Ressam saw what was going on, he slipped out of his coat and fled on foot. Inspectors Johnson and Chapman immediately gave chase but Ressam, with a slight head start, managed to temporarily escape. Inspector Chapman found Ressam hiding under a pick-up truck. Although the inspector had drawn his gun and ordered Ressam to come out, Ressam attempted to flee a second time. This time Ressam tried to seize control of a car in an intersection, causing the driver to run a red light to escape.

Ultimately, the inspectors seized Ressam and brought him back to the secondary inspection area where Customs Officials had begun processing the contents of the trunk. Not realizing what they were dealing with, the inspectors shook some of the items as they were removing them. Inspectors noticed that Ressam would duck down behind the automobile door where he was seated as the items were being removed.

Ressam's fear was warranted. FBI Supervisory Special Agent Gregory Carl testified at Ressam's trial as to the explosive force of the 2.6 pounds of EGDN Ressam was transporting in olive jars. Carl explained that EGDN is equivalent to approximately two times the power of TNT. Carl then prepared a test using the equivalent of the materials Ressam was carrying -- at both one quarter (because Ressam had four timing devices), and the full explosive strength. The video depicting these explosions, shown at trial, showed the utter devastation Ressam's explosives would have caused – the entire quantity completely destroyed a car, and the blast zone

reached hundreds of feet.  Clearly, Ressam's bombs, placed at a crowded airport terminal during the busiest travel time of year, would have killed and maimed hundreds of innocent people.

### III.    SENTENCING FACTORS

In <u>United States v. Booker</u>, 125 S. Ct. 738 (2005), the Supreme Court recently clarified the process sentencing courts should undertake in determining a fair and just sentence.  A court should, first, consider the sentencing guidelines and determine the applicable advisory guideline range.  Next, the court should consider the factors set forth in 18 U.S.C. § 3553.  As Judge Breyer noted in <u>Booker</u> at 764-765:

> The Act nonetheless requires judges to consider the Guidelines 'sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant,' § 3553(a)(4), the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims, §§ 3553(a)(1), 3, (5)-(7) (main ed. and Supp. 224).  And the Act nonetheless requires judges to impose sentences that reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and effectively provide the defendant with needed educational or vocational training and medical care.

**A.    SENTENCING GUIDELINE CALCULATIONS**

The United States Probation Office Revised Presentence Report (dated March 25, 2003) accurately sets forth the sentencing guideline calculations.[1]  The guideline calculations capture the seriousness of Ressam's crimes and conduct.

   1.    *Count 1*:    Committing an Act of Terrorism Transcending a National Boundary.

Ressam was convicted in Count 1 of Committing an Act of Terrorism Transcending a National Boundary, in violation of 18 U.S.C. § 2332b(a)(1)(B).  Since § 2332b is not listed in the statutory index, U.S.S.G. § 1B1.2 directs that  the most analogous guideline section should be used.  Section 2K1.4, property damaged by use of explosives, appears to be most analogous section.  Under § 2K1.4, "if the offense

[1]  The November 2000 edition of the United States Sentencing Commission Guidelines Manual has been used to calculate the applicable sentencing range.

GOVERNMENT'S SENTENCING
MEMORANDUM/RESSAM - 6
CR99-666C

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

(A) created a substantial risk of death or serious bodily injury to any person other than a participant in the offense, and that risk was created knowingly," the base offense level is 24. Under U.S.S.G. § 3A1.4(a), "if the offense is a felony that involved, or was intended to promote, a federal crime of terrorism," the offense level should be increased by 12, thus providing an adjusted offense level of 36. In addition, under § 3A1.4(b), a defendant's criminal history category "shall be VI for offenses intended to promote a federal crime of terrorism." Thus, the applicable sentencing guideline range for Count 1 is a sentence of no less than 324 months and no more than 405 months. Since § 2332b has a statutory maximum of 25 years (300 months), the sentencing guideline range for Count 1 is 300 months.

It should be noted that § 2332b(c)(2), Consecutive Sentence, requires that the term of imprisonment imposed under this section "shall" run consecutively with any other term of imprisonment. The statute, therefore, mandates that the sentence imposed by the Court on Count 1 (which the Sentencing Guidelines set at 300 months) be imposed to run consecutively to any sentence imposed on Counts 2, 3, 4, 5, 6, 7 and 8. (Count 9, carrying an explosive during the commission of a felony in violation of 18 U.S.C. § 844(h)(2), requires the Court to impose a mandatory ten-year term of imprisonment to run consecutively to any other term of imprisonment imposed.)

2. *Counts 2, 6, 7 and 8*:    Placing an Explosive in Proximity to a Terminal; Smuggling; Transportation of Explosives; and Possession of an Unregistered Destructive Device.

Ressam was convicted in Count 2 of Placing an Explosive in Proximity to a Terminal, in violation of 18 U.S.C. § 33; in Count 6 of Smuggling, in violation of 18 U.S.C. § 545; in Count 7 of Transportation of Explosives, in violation of 18 U.S.C. § 842(a)(3)(A); and in Count 8 of Possession of a Destructive Device, in violation of 26 U.S.C. §§ 5841, 5861(d) and 5871. Pursuant to grouping provisions U.S.S.G. § 3D1.2(b), these counts should be grouped (Group 1) because they involve the same victim and two or more acts connected by a common scheme or plan. The Count 6

GOVERNMENT'S SENTENCING
MEMORANDUM/RESSAM - 7
CR99-666C

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

smuggling conviction under § 2T3.1, which in turn cross-references § 2K2.1 (transportation of a destructive device), contains the highest base offense level - 20. There are three specific offense characteristics that are also applicable to Count 6: a one-point upward adjustment pursuant to § 2K2.1(b)(1)(A) for committing an offense involving three to four destructive devices; a two-point upward adjustment pursuant to § 2K2.1(b)(3) for committing an offense involving a destructive device; and a four-point upward adjustment pursuant to § 2K2.1(b)(5) for possessing a destructive device with knowledge that it would be used or possessed in connection with another felony offense. There is also one victim-related adjustment applicable to Count 6: a twelve point upward adjustment pursuant to § 3A1.4(a) for committing a felony that involved, or was intended to promote, a federal crime of terrorism. These enhancements yield an adjusted offense level of 39.

       3.    *Counts 3, 4 and 5*: Possessing False Identification Documents; Using a Fictitious Name for Admission into the United States; and Making a False Statement.

Ressam was convicted in Count 3 of Possessing False Identification Documents, in violation of 18 U.S.C. § 1028; in Count 4 of Using a Fictitious Name for Admission into the United States, in violation of 18 U.S.C. § 1546; and in Count 5 of Making a False Statement, in violation of 18 U.S.C. § 1001. Pursuant to U.S.S.G. § 3D1.2(b), these counts should be grouped (Group 2) because they involve the same victim and two or more acts connected by a common scheme or plan. The Count 3 conviction for possessing false identification documents is governed by § 2L2.2, which instructs a Court to cross-reference a more relevant sentencing guideline section if the defendant used a passport "in the commission of a felony offense, other than an offense involving violation of the immigration laws." The most analogous substantive offense is Count 1, which leads to the previously-discussed guideline calculations under § 2K1.4: base offense level 24, plus a twelve point adjustment pursuant to § 3A1.4(a) for committing

GOVERNMENT'S SENTENCING
MEMORANDUM/RESSAM - 8
CR99-666C

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

a felony that involved, or was intended to promote, a federal crime of terrorism. Thus, the adjusted offense level is 36.

4. *Count 9*:    Carrying an Explosive Device during the Commission of a Felony.

Ressam was convicted in Count 9 of Carrying an Explosive Device during the Commission of a Felony, in violation of 18 U.S.C. § 844(h)(2). This statute requires the Court to impose a ten-year mandatory sentence of imprisonment to run consecutively to all other charges.

5. *Multiple Count Adjustment*

U.S.S.G. § 3D1.4 provides that Groups 1 and 2 are each assigned one unit (two total units), resulting in a two-level increase to the group with the highest offense level. This yields an adjusted offense level of 41 for Counts 2-8. Under § 3A1.4(b), a defendant's criminal history category "shall be VI for offenses intended to promote a federal crime of terrorism." Thus, the applicable sentencing guideline range for these counts is a sentence of 360 months to life.

6. *Final Sentencing Guideline Calculations*

Based on a total offense level of 41 and a criminal history category of VI, the guideline range of imprisonment on Counts 2-8 is 360 months to life. The term of imprisonment imposed on Count 1 is to run consecutively to the term of imprisonment imposed on Counts 2-8. The guideline range on Count 1, based on a total offense level of 36 and a criminal history category of VI, is 324 months to 405 months. However, since the maximum sentence the Court may impose on Count 1 is 25 years, the guideline calculations is 300 months. Therefore the combined guideline range for Counts 1-8 is 660 months to life. Finally, the sentence on Count 9 requires a 10-year mandatory consecutive sentence.

Under the Sentencing Guidelines, ***THE LOW END OF RESSAM'S SENTENCING RANGE IS 780 MONTHS (65 YEARS).***

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**B.     18 U.S.C. § 3553(a) SENTENCING FACTORS**

In addition to considering the applicable sentencing guideline range, Courts are instructed to consider a number other additional factors, under § 3553.

1.     *The nature and circumstances of the offense and the history and characteristics of the defendant*.

The offenses for which Ressam was convicted are among the most serious in criminal law.  (The fact that the low end of the applicable sentencing guideline ranges is 780 months illustrates the seriousness of the offenses.)  As the events of 9/11 proved beyond all doubt, terrorists are not just attempting to murder innocent civilians and destroy landmark structures.  Their goal is much broader - they are seeking to tear the fabric that binds the people of our nation together, and the nations of the world together.

Ressam intended by his actions to fulfill the fatwa issued by Osama bin Laden the year before. In 1998, bin Laden and Egyptian physician Ayman al Zawahiri arranged for the publication of a fatwa, an interpretation of Islamic law, "Claiming that America had declared war against God and his messenger, and they called for the murder of any American, anywhere on earth, as the 'individual duty for every Muslim who can do it in any country in which it is possible to do it.'" The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks Upon the United States, at 47 (2004).

In accordance with this fatwa, Ressam's plan was not simply to plant a bomb. He chose to plant his bomb at an international airport, and thereby lay in ruins one of our nation's most critical transportation systems.  And Ressam did not randomly choose any airport:  he chose Los Angeles International Airport, the fifth busiest airport in the world and in one of the country's largest urban areas.  He did not randomly choose any date:  he chose the millennium so that the chaos and fear flowing from his act would be magnified ten-fold.

Ressam's history and characteristics provide little support for leniency. Ressam supported himself primarily through criminal activity. He assumed numerous false identities (Nassar Ressam, Anjer Tahar Medjadi, and Benni Noris) to allow him to illegally enter and remain in various countries. While in Canada, Ressam submitted false statements in a failed effort to obtain asylum. He ignored judicial deportation orders, and was arrested on theft related offenses in 1996 and 1997. He was convicted in France (in absentia) in connection with terrorist related activities committed by a group of extremists associated with Fateh Kamel. Between March 1998 and February 1999, Ressam was in Afghanistan training to be a terrorist. After he returned and until he was arrested in December 1999, Ressam undertook a series of steps to convert his terrorist training to action. In sum, during Ressam's entire adult life, he has been immersed in committing all manner of crimes.

    2(A).  *The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the crime.*

The Sentencing Guidelines recommended range of 65 years reflects the extraordinary gravity of Ressam's offenses. But for the professional (and fortuitous) work of the Port Angeles Customs Inspectors, the shock to our nation that occurred on 9/11 would have occurred 18 months earlier.

Ressam, as with all terrorists, was attempting to do more than murder innocent people: he was participating in a war intended to claim as many innocent lives as possible. The 9/11 attacks in the United States, the Madrid train bombings in Spain, the Bali explosion in Australia, and the murder of Theo van Gogh in the Netherlands are recent examples of criminal activity that extend far beyond the specific crime. The killing of van Gogh on November 2, 2004, by Mohammed Bouyeri (allegedly) is especially illustrative. On the one hand, it was simply a murder, a crime that sadly occurs daily throughout the world. But van Gogh's homicide was more than murder, it was a terrorist act. By targeting van Gogh because he had made a controversial film

GOVERNMENT'S SENTENCING
MEMORANDUM/RESSAM - 11
CR99-666C

about Islamic culture, by killing him publicly on the streets of Amsterdam, by almost beheading him, by pinning a five page letter to his body with a second knife, the perpetrators of this murder committed a terrorist act.  In the days following van Gogh's death, more than 60 mosques and churches were reportedly the victims of arson attacks.  Several leading European newspapers speculated that the murder would end the dream of multiculturalism for Europe.

Ressam was looking for a similar impact.  He intentionally chose a target within the United States at one of the world's largest urban centers.  He chose a critical industry and a vulnerable time.  Ressam's solemn and intended goal was to wreak destruction - on lives, on structures, and on the nation.  His sentence should be an unfaltering response to that heinous goal.

The American people and the world at large must have confidence that our justice system works -- that when terrorists are arrested and indicted, they will be fairly tried. When they are convicted, they will be held fully accountable for their crimes. In this case, that punishment begins with a 65-year guideline range, and then takes into account the inconstant cooperation Ressam provided the United States and other countries.

2(B).   *The need for the sentence imposed to afford adequate deterrence to criminal conduct.*

The unfortunate reality of today's world is that the threat of future terrorists attacks is a continuing and genuine threat.  The number one priority of the President, the Department of Justice, the Federal Bureau of Investigation, and the Department of Homeland Security has been, and continues to be, to protect America against the confounding menace of terrorism.  The federal government itself has undergone a wartime reorganization to address this threat.

The sentence this Court imposes on Ressam must impart a deterrent to others contemplating actions against the United States.  It must broadcast a clear message to extremists that when caught and convicted, they will suffer serious consequences.  At

least one commentator has discussed the importance of deterrence particularly as it relates to acts of terrorism.  In <u>Why Terrorism Works</u>, attorney Alan Dershowitz chronicled the rising tide of terrorism in the latter Twentieth Century, particularly noting the toothless response of other nations.  He concluded:

> [I]t is highly likely that an immediate and firm negative, rather than positive, response to terrorism would have reduced its frequency and severity. . .This requires unambiguous action that sends only one clear message –  namely, that terrorism *never* pays, that it *always* sets back the cause, and that, if the cause is to succeed, then its leaders must resort to other techniques for bringing about change.
>             . . .
>
> The only way [terrorism] can be thwarted is by eliminating the incentives for terrorism and enforcing disincentives, severely punishing and incapacitating the terrorists themselves, and delegitimizing their leaders.  If the international community had taken these measures – instead of rewarding terrorist acts, releasing the terrorists, and honoring their leaders –  it would almost certainly have made a considerable difference in how terrorism was viewed by those contemplating its continued use as a tactic for change.

Alan Dershowitz, <u>Why Terrorism Works</u>, (Yale University Press, 2002) at 86, 88 (emphasis in original).

In sum, it is quite possible that the deterrent impact of this Court's sentence will be far greater than in any other case this Court has ever considered, in terms of the message this Court sends to others considering similar acts.

2(C).   *The need for the sentence imposed to protect the public from further crimes of the defendant.*

Ressam's arrest on December 14, 1999, was not the result of a sudden lapse of judgment.  It was the culmination of years of planning and work, all aimed at causing as much harm to the United States as he could possibly inflict.  Ressam's hatred toward the United States and its people was not something that he could simply shut off.

Following his conviction in April 2001, Ressam claimed that after he observed the fairness with which the Court treated him throughout the trial, he had a change of heart.  He declared that he was "firmly against" terrorist operations in America and around the world.  Ressam's sudden change of heart raises suspicion about the motivations for his cooperation. It suggests that Ressam chose to go to trial because he

GOVERNMENT'S SENTENCING
MEMORANDUM/RESSAM - 13
CR99-666C

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

had no intention of accepting responsibility for his actions and felt no remorse for them. It suggests that Ressam embraced America only after he was convicted and faced the near certainty that his sentence of imprisonment would ensure he would die in prison. Regardless of motivation, Ressam chose to cooperate and then, after he extracted the substantial assistance motion from the United States, he chose to end his cooperation.

If Ressam had undergone a genuine change of heart, as opposed to merely trying to minimize his period of incarceration, he would continue to cooperate. His decision to end cooperation raises the specter that he continues to pose a real and serious threat to the United States. Thus, this Court must decide at what age would Ressam no longer pose a threat to this county.

6.    *The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.*

It is difficult to find other analogous defendants that provide the Court a clear comparison. There are, however, a few cases for the Court to consider:

***United States v. Mokhtar Haouari***:  CR00-00015, SD NY:

Mokhtar Haouari and Abdel Meskini, were indicted on January 6, 2000, on 8 counts in the United States Court for Southern District of New York. The defendants were indicted based on their connection to Ressam and fugitive Abdelmajid Dahoumane.  A credit car in Ressam's possession linked him to Defendant Haouari.

Haouari and Meskini were charged with:  2 counts for violations of 18 U.S.C.§ 371 & 18 USC § 842, conspiracy to provide false identification for the purposes of importing, manufacturing, or dealing in explosive materials;  2 counts for violations of 18 USC § 1028, fraud related to identification documents; 2 counts for violations of 18 USC § 1029, fraud using an access device; 1 count for violating 18 USC § 1344, bank fraud; and, 1 count for violating 18 U.S.C.§ 922, importing or manufacturing firearms or ammunition without a license.

Meskini pleaded guilty prior to trial to all counts and was sentenced to a total of 72 months and ordered to pay $59,545 in restitution. Tried on seven counts, Haouari was convicted on counts 1, 3, 4, 5, and 6. He was acquitted of count 2, and the government dismissed count 7. On January 17, 2002, Haouari was sentenced to a total of 288 months in prison.

*United States v. Ramzi Yousef, et al*:     CR93-180-KTD SD NY  (World Trade Center Bombings)

On February 26, 1993, at approximately 12:18 p.m., an improvised explosive device detonated on the second level of the World Trade Center parking basement. The resulting blast produced a crater, approximately 150 feet in diameter and five floors deep, in the parking basement. The main explosive charge consisted of approximately 1,200 to 1,500 pounds of a homemade fertilizer-based explosive, urea nitrate.  The investigation following the explosions linked several distinct groups to the bombing and resulted in an indictment that was filed on March 17, 1993.  The investigation continued for almost two years after the first indictment.  The final 20-count indictment, filed on December 13, 1995, named 10 defendants.

Ramzi Ahmed Yousef was convicted of 18 counts, including: destruction by explosion by Improvised Device causing death; assault upon a federal officer with a deadly weapon; using a destructive device in relation to an assault of a federal officer; attempt to destroy aircraft; attempt to bomb U.S. commercial airliner; conspiracy to kill U. S. nationals with the intent of retaliate against the government; and, conspiracy to bomb U.S. nationals out side the U.S. and bombing a civil aircraft.  Yousef was sentenced to 8 life sentences plus 240 years, fined $4.5 million dollars, and ordered to pay $250 million dollars in restitution.

Mahmud Abdouhalima was convicted on 9 counts, sentenced to 240 years imprisonment, fined $250,000, and ordered to pay $250 million dollars in restitution.

Mohammad Salameh was convicted of 10 counts, sentenced to nearly 117 years imprisonment, fined $250,000, and ordered to pay $250 million dollars in restitution.

Nidal Ayyad was convicted of 9 counts, sentenced to 117 years, fined $250,000, and ordered to pay $250 million dollars in restitution.
Bilal Alkaisi turned states evidence and pleaded guilty to one count, making false statements. He was sentenced to 20 months and 2 years supervised release.

Ahmad Mohammad Ajaj was convicted of 9 counts, sentenced to 115 years, fined $250,000, and ordered to pay $250 million dollars in restitution.
Abdul Hakim Murad was convicted on 7 counts, sentenced to life plus 60 years of imprisonment, and fined $250,000.

Eyad Ismoil was convicted of 10 counts, sentenced to 240 years imprisonment, fined $250,000, and ordered to pay $10 million dollars in restitution.

*United States v. Mohamed al-'Owhali, et al*:  CR98-1023 SD NY (Embassy Bombings)

On August 7, 1998, bombs exploded at the United States Embassys in Kenya and Tanzania killing 224 people, including 12 Americans.  After a series of indictments were returned relating to the bombings, one defendant pleaded guilty and four defendants went to trial.

GOVERNMENT'S SENTENCING
MEMORANDUM/RESSAM - 15
CR99-666C

**Mohamed Rashed Daoud Al-Owhali**, a Saudi, was the passenger in the actual bomb truck. He got out of the truck and threw a stun grenade at the guards before fleeing the scene. Owhali survived the bomb blast and was arrested at the hospital.  In May 2001, Owhali was convicted by a federal jury of conspiracy and 213 counts of murder, including 12 Americans, in the bombing of the U.S. Embassy in Kenya. He was sentenced to life in prison without the possibility of parole.

**Khalfan Khamis Mohamed,** a Tanzanian, was arrested in South Africa and extradited to the U.S. in October 1999. His house was used as a bomb factory and a base of operations for the bombing conspiracy. In May 2001, Mohamed was convicted by a federal jury of conspiracy to kill Americans and 11 counts of murder in the bombing of the U.S. Embassy in Tanzania. He was sentenced to life in prison without the possibility of parole.

**Mohammed Saddiq Odeh**, a Jordanian, was arrested trying to enter Pakistan with a fake Yemeni passport on the day of the East African Embassy bombings. He was interrogated by Pakistani officials, and he eventually admitted being part of the Embassy bombing conspiracy.  In May 2001, Odeh was convicted by a federal jury of conspiracy in the Kenya bombing.  He was sentenced to life in prison without the possibility of parole.

**Wadih El Hage**, an American citizen, was a known bin Laden associate.  In May 2001, El Hage was found guilty by a federal jury of conspiracy and perjury.  He was sentenced to life in prison without the possibility of parole.

**Ali Mohamed,** a 48 year old Egyptian native and former U.S. Army sergeant, plead guilty to charges resulting from the embassy bombings. On Friday, October 20, 2000, Mohamed told Judge Leonard Sand of the U.S. District Court in Manhattan that at the request of bin Laden, he had conducted surveillance of U.S., British, and French targets in Nairobi, including the U.S. Embassy. He then delivered pictures, diagrams, and a report to bin Laden in Khartoum, Sudan. He said that bin Laden looked at a photograph of the U.S. Embassy and pointed to the place where a bomb truck could be driven through. The targets were chosen, Mohamed said, to retaliate against the U.S. intervention in the civil war in Somalia.  Mohamed pleaded guilty to five federal counts of conspiracy, which included plotting to kill U.S. citizens, destroy U.S. facilities, and murder U.S. soldiers in Somalia and Saudi Arabia.  Mohamed has not yet been sentenced.

C.    <u>**SUBSTANTIAL ASSISTANCE**</u>.

After considering the defendant's guideline range and the statutory sentencing factors, this Court must also consider what affect the defendant's substantial assistance should have on his sentence.

1.    <u>**The Government's Substantial Assistance Motion.**</u>

On February 26, 2003, the United States filed a motion pursuant to U.S.S.G. § 5K1.1 to sentence Ressam  "below the otherwise applicable guideline range."  The motion was based on Ressam's "substantial assistance in the case of <u>United States v.</u>

GOVERNMENT'S SENTENCING
MEMORANDUM/RESSAM - 16
CR99-666C

Maohtar Haouari, a matter prosecuted in the Southern District of New York in the summer of 2001."

The Southern District of New York has filed a motion describing Ressam's cooperation in the Haouari case.  The motion details Ressam's initial cooperation in the investigation and indictment of Abu Doha (pending extradition from the United Kingdom) and Samir Ait Mohamed (pending extradition from Canada).  In assessing how much of a benefit Ressam should receive for this cooperation,  the Court must also take into account more recent events.

Section 5K1.1 of the Guidelines is framed to recognize a defendant's "substantial assistance in the investigation or prosecution of another person who has committed an offense."  Ressam provided substantial assistance in the case of Haouari by testifying at the trial.  This clearly falls within the scope of § 5K1.1.  Ressam also provided "cooperation" in the form of intelligence debriefings to the United States and other countries. Whether that type of activity falls under § 5K1.1 is an open question that the Court need not address since Ressam's intelligence debriefings are clearly a factor that the Court should consider in arriving at Ressam's final sentence of imprisonment under 18 U.S.C. § 3553 and United States v. Booker, 125 S. Ct. 738 (2005).

**2.    The Cooperation Agreement**

On June 23, 2001, Ressam and his attorneys signed a cooperation agreement with the United States.  (See Attachment 1.)  This agreement required Ressam to cooperate with law enforcement and intelligence agencies from the United States and from foreign countries by providing complete and truthful information and by testifying truthfully before the grand jury or at any trial, including the trial in the Southern District of New York against Mokhtar Haouari.  Prior to signing the cooperation agreement, Ressam had previously provided statements to federal law enforcement personnel on May 10, 16, 17, 22,  and 24 of 2001.  In these statements, Ressam detailed, among other topics, his planned bombing of LAX, the training camps in Afghanistan, and the identity and positions of individuals involved in other terrorist

GOVERNMENT'S SENTENCING
MEMORANDUM/RESSAM - 17
CR99-666C

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

cells outside the United States.  It should be noted that of the 55 pages in reports produced by the Federal Bureau of Investigation in connection with these five debriefings, only a small portion was devoted to Mokhtar Haouari.  In exchange for Ressam providing intelligence information and testimony at trial, the United States agreed to file a § 5K1.1 motion if his cooperation proved to be of "substantial assistance."

The June 23, 2001, cooperation agreement had one additional critical element:

> **"Further, the parties stipulate and agree that if the government files a downward departure motion, pursuant to U.S.S.G. 5K1.1, in view of the defendant's crime and notwithstanding any assistance provided by Ressam, the government _and the defense_ will jointly recommend that the defendant be sentenced to a term of imprisonment of not less than twenty-seven (27) years.  That is, while either party may recommend a sentence not less than twenty-seven (27) years, the government may recommend a sentence in excess of twenty-seven (27) years up to the high end of the applicable guideline range."**

The Court should honor this cooperation agreement entered into by both parties.  This is especially true given the present situation where Ressam has not even lived up to the requirements of the agreement.  His decision to end his cooperation not only jeopardizes two critical pending criminal extradition matters (Abu Doha and Samir Ait Mohamed), it is a clear violation of his agreement.

In correspondence to Ressam's attorney in March 2002 related to continuing the sentencing date, the government stated:

> "Because Mr. Ressam's cooperation is incomplete, [we] cannot predict what sentence the government will ultimately recommend.  However, the greater amount of cooperation Mr. Ressam has rendered to the government at the time of sentencing, the more equity he will hold in the calculation of the government's sentencing recommendation.  As noted above, at this time, the government is not prepared to reconsider the 27 year floor.  _Further, based on the cooperation to date, we would not recommend a sentence in the 27 year range_."

Thus, as of March 2002, and well before Ressam breached the agreement by ceasing all cooperation, the government had determined that its recommendation would be over 27 years.

**3.** **Ressam's Refusal to Cooperate and Rejection of the Cooperation Agreement.**

Since entering into the cooperation agreement, Ressam has reneged on his promise to cooperate and, in doing so, has created new and serious problems for prosecutions in this country. The United States currently finds itself in the extremely difficult situation of trying to proceed with these critical prosecutions after the most significant evidence (Ressam's testimony) has evaporated.  The situation is especially troubling because the United Kingdom and Canada arrested Doha and Mohammed respectively and have detained the men for several years based on the United States' assurances that we had sufficient evidence to convict the men of the pending charges (Doha was arrested in February 2001, as he attempted to fly from London's Heathrow Airport to Saudi Arabia under a false passport.  Mohammed was arrested by Canada on July 2001, as he attempted to cross the border from Canada into the United States.) To dismiss the charges would be a significant blow to the United States' efforts to fight the global war on terrorism.

**4.** **The Report of Dr. Stuart Grassian**.

Ressam has attempted to justify his current refusal to cooperate by submitting to the Court a report by Dr. Stuart Grassian, a psychiatrist who espouses expertise on the effects of solitary confinement.  Dr. Grassian's report is an interesting assemblage of observations and commentary, the entirety of which suggests that Dr. Grassian perceives his role to be far more that of an advocate than that of a dispassionate clinician.

Dr. Grassian's research and methodology on the effects of solitary confinement have recently come under attack. For example, in April, 2005, Grassian testified in the case of Michael Ross, a serial killer and Ivy League graduate who confessed to killing eight teenage girls and young women. Ross was convicted of six counts of capital murder and for several years has asked that his appeals be stopped and that he be put to death. Dr. Grassian, who admitted to a reporter his opinion that the death penalty

GOVERNMENT'S SENTENCING
MEMORANDUM/RESSAM - 19
CR99-666C

"doesn't serve us well," (Matt Apuzzo, "Psychiatrist Says Ross Wants to Go Out in Blaze of Glory," Newsday.com, April 12, 2005), has testified against Ross' own wishes, asserting that Ross's confinement conditions led to Ross's mental incompetence. Another expert in the Ross case testified, "I have not found any research that supports [Dr. Grassian's] theory," and she criticized Grassian's methodology. (Associated Press, "Ross Psychiatrist Says He's Competent," April 12, 2005). [2]  Ross's own attorney "was especially harsh with Dr. Stuart Grassian. [The attorney] said Grassian manipulated facts to make Ross fit his theory that solitary confinement can create mental incompetence." (Matt Apuzzo, "Judge Promises Ruling Soon on Ross Competency," Newsday.com, Aporil 15, 2005).  The Ross case highlights the danger of this Court relying solely on Dr. Grassian's report, without subjecting his conclusions and methodology to careful scrutiny.

Even assuming that Dr. Grassian's opinions are solely the result of clinical objectivity and not serving a philosophical agenda, this Court must acknowledge that Ressam's time in solitary confinement was limited in duration and, for a significant portion of time, at his request.  After his arrest in December 1999, Ressam spent all of 2000 meeting extensively and frequently with his defense team preparing for trial. Ressam was transferred to Los Angeles for trial in early 2001, and was in trial during March and April.  Within weeks of his conviction, Ressam began a series of debriefings and interviews with law enforcement personnel that lasted through the end of 2001 and beginning of 2002.  (For a more complete picture of the extensive contact Ressam had following his conviction, see Docket 357, Defendant's Preliminary Submission on the Duration and Nature of His Cooperation filed April 12, 2005.)  On March 1, 2002, AUSA Jerry Diskin sent a letter to Ressam's defense team offering to

---

[2] Dr. Grassian's opinions have been subject to similar objections in the past, one expert claiming, "Dr. Grassian's research 'does not stand up to the most elementary form of scientific scrutiny." McClary v. Kelly, 4 F.Supp.2d 195, 207 (W.D.N.Y. 1998).

GOVERNMENT'S SENTENCING
MEMORANDUM/RESSAM - 20
CR99-666C

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

assist in getting Ressam removed from solitary and placed him in the Bureau of Prisons Witness Security Program. That offer was rejected. It is inconceivable that the defense would have rejected the government's offer if Ressam suffered the alleged extraordinary hardships of solitary confinement. Thus, factually, Dr. Grassian simply is not accurately portraying Ressam's confinement. Moreover, the letter submitted to this Court by the United States Attorney's Office for the Southern District of New York points out that since at least April, 2004, Ressam has been in the Witness Security Program, in a facility where he is not housed in solitary confinement. Thus, for at least a year, his confinement conditions should have led to some change in his willingness to cooperate. That Ressam has not altered his mind set suggests that he believes he has achieved his objective--receiving a lesser sentence with no further cooperation required.

### 5.     Conclusion.

In sum, even taking into account that Ressam's purported cooperation, resulted in his taking one step forward by testifying in the Haouari trial, but then two steps backward by reneging on his promise to cooperate against Doha and Mohammed. This Court must consider the serious repercussions of Ressam's reneging on his agreement to cooperate - a promise which, under its terms, was to be ongoing so long as the government sought his cooperation.

In light of this incomplete cooperation, the government's recommendation, which takes *thirty years* off of the low end of Ressam's guideline range, is extraordinarily generous. The government's recommendation has taken into consideration the multiple occasions that Ressam has met with and provided information to the United States and international law enforcement agencies, and his testimony in the Haouari trial in New York  The government's recommendation has also taken into account Ressam's decision to end all future cooperation with the government.

GOVERNMENT'S SENTENCING
MEMORANDUM/RESSAM - 21
CR99-666C

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## IV.    GOVERNMENT'S SENTENCING RECOMMENDATION

In considering the applicable sentencing guideline range, the factors under § 3553(a), Ressam's cooperation in the trial of Haouari, his cooperation in providing intelligence to the United States and other countries, his decision to cease his cooperation, his age, and his potential danger when released, the United States recommends that the Court impose a thirty-five (35) year sentence of imprisonment.

If Ressam had not been captured at the United States border, hundreds of innocent men, women, and children would have died or been severely injured at his hand. The sentence that this Court imposes must be commensurate with the

GOVERNMENT'S SENTENCING
MEMORANDUM/RESSAM - 22
CR99-666C

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

malevolence intended by that crime, and must acknowledge the worldwide condemnation of terrorism, in all its forms.

DATED this 20th day of April, 2005.

Respectfully submitted,


S/JOHN McKAY
JOHN McKAY
United States Attorney
WA Bar #12935
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, WA 98101
Telephone:    206-553-7970
Fax No.:      206-553-0755
E-Mail:       John.McKay@usdoj.gov


S/MARK N. BARTLETT
MARK N. BARTLETT
First Assistant United States Attorney
WA Bar #15672
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, WA 98101
Telephone:    206-553-7970
Fax No.:      206-553-0755
E-Mail:       Mark.Bartlett@usdoj.gov


S/MIKE LANG
MIKE LANG
Assistant United States Attorney
WA Bar #19262
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, WA 98101
Telephone:    206-553-7970
Fax No.:      206-553-0755
E-Mail:       Mike.Lang@usdoj.gov

GOVERNMENT'S SENTENCING
MEMORANDUM/RESSAM - 23
CR99-666C

CERTIFICATE OF SERVICE

I hereby certify that on April 20, 2005, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing  to the attorney(s) of record for the defendant(s).  I hereby certify that I have served the attorney(s) of record for the defendant(s) that are non CM/ECF participants via telefax.

s/FAY FRENCH
Fay French
Program Assistant
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, Washington 98101
Phone: (206) 553-2270
FAX:   (206) 553-0755
E-mail: Fay.French@usdoj.gov

GOVERNMENT'S SENTENCING
MEMORANDUM/RESSAM - 24
CR99-666C